**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1934-24

K.K.,[1]

    Plaintiff-Appellant,

v.

BRAD HOLMBERG and ANIMAL
EYE CENTER OF NEW JERSEY,

    Defendants,

and

ORADELL ANIMAL
HOSPITAL, DEBORAH HALL,
and JOHN LUCY,

    Defendants-Respondents.

_____

Argued April 13, 2026 – Decided April 27, 2026

Before Judges Sabatino, Walcott-Henderson and Bergman.

---

[1] We use initials to protect the privacy of the plaintiff concerning her psychological records. R. 1:38-3(a)(2).

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-1549-21.

Kevin Haverty argued the cause for appellant (Williams Cedar, LLC, attorneys; Kevin Haverty, on the briefs).

Walter F. Kawalec, III, argued the cause for respondents (Marshall Dennehey, PC, attorneys; Maura Waters Brady and Walter F. Kawalec, III, on the brief).

PER CURIAM

Plaintiff, K.K., the former owner of a now-deceased dog, appeals summary judgment granted to defendants, an animal hospital and two of its doctors, in this veterinary malpractice case. At various points of her life, the dog, a twelve-year-old miniature Schnauzer named Olive, had diabetes, cataracts, and various other ailments. After numerous visits to defendants' practice, the dog was referred to a veterinary eye specialist, who eventually conducted cataract surgery on Olive; her eye later had to be surgically removed by a non-party veterinary practice. The dog's condition worsened soon thereafter, and she was euthanized. Plaintiff filed suit, at times representing herself and at other times proceeding with counsel. She voluntarily dismissed her claims against the eye specialist and his practice.

After the pretrial discovery period ended, the trial court granted defendants' motion to bar plaintiff's expert veterinarian because, unlike them, he

2

is not similarly board-certified in small-animal practice. The court, by analogy, applied the stringent like-credentialed expert witness requirements for malpractice cases against physicians codified in the Patients First Act, N.J.S.A. 2A:53A-41. The court further deemed the expert's conclusions in his report that defendants deviated from veterinary standards of care to be inadmissible "net opinions." Plaintiff's claims of negligent infliction of emotional distress were also dismissed by the court with prejudice. Plaintiff now appeals those rulings.

For the reasons that follow, we reverse the trial court's application of the Patients First Act because this malpractice lawsuit does not involve defendant physicians. As the Supreme Court instructed in Meehan v. Antonellis, 226 N.J. 216, 221 (2016), the Patients First Act only applies to physicians and not other professionals. We also reverse the trial court's finding that plaintiff's expert lacks sufficient qualifications under N.J.S.A. 2A:53A-27 and N.J.R.E. 702 to testify about the pertinent veterinary standards of care.

With respect to the trial court's net opinion ruling, we remand the matter for a Rule 104 evidentiary hearing pursuant to Kemp v. State, 174 N.J. 412, 432-33 (2002), at which the expert may testify and the record can be developed more fully to enable a fairer assessment of the admissibility of his specific opinions.

A-1934-24

Lastly, we remand this matter to the trial court for further consideration of the viability of plaintiff's claim of negligent infliction of emotional distress, in light of her deposition testimony and psychological evidence that potentially could support her theory that she was more than a mere "bystander" to Olive's suffering.

I.

Because the case has not been tried and we are remanding for further proceedings, we need not recount the facts and procedural history comprehensively and definitively. The following brief summary will suffice for purposes of this remanding opinion.

Plaintiff was the owner of Olive, a miniature Schnauzer. At the time of her death, Olive had recently turned twelve years old.

In May 2018, plaintiff first brought Olive to defendant Oradell Animal Hospital, reporting that Olive had recently been restless and appeared to be in pain. While receiving care at Oradell, Olive was determined by co-defendants[2] Deborah Hall, D.V.M., and John Lucy, D.V.M., to have diabetes. Olive was

---

[2] For clarity, we refer collectively to these three parties as "the Oradell defendants," unless the context otherwise indicates.

prescribed insulin shots, which the doctors instructed plaintiff to administer to her for the remainder of the dog's life.

Two months later, a consulting ophthalmologist at Oradell first noted small cataracts in both of Olive's eyes, which, by the end of 2018, had progressed to fully developed "mature diabetic cataracts." In early 2019, Olive was first taken by plaintiff to see defendant Bradford J. Holmberg, D.V.M., at co-defendant Animal Eye Center of New Jersey ("Animal Eye Center")[3] for prospective cataract surgery. This surgery was ultimately performed on the dog by Dr. Holmberg on May 2, 2019. Prior to undergoing that cataract surgery, Olive was additionally diagnosed by Dr. Lucy at Oradell with: (1) pancreatitis, (2) diabetes mellitus[4], and (3) hyperlipidemia.[5]

---

[3] Unless the context otherwise indicates, we hereafter refer to Dr. Holmberg and his practice collectively as "the Animal Eye Center defendants."

[4] Defined in Black's Veterinary Dictionary 133-34 (20th ed. 2001) as "a condition in which there is excessive glucose in the blood (hyperglycaemia). This produces various symptoms: thirst, polyuria, weight loss, recurrent infection; in more severe cases, diabetic coma (ketoacidosis), progressive disease of the kidneys and retina, which may lead to blindness, may occur. . . . The only effective method of treatment is injection of insulin (which is ineffective if given by mouth) at regular intervals for the rest of the animal's life, and attention to diet."

[5] Defined in Delmar's Veterinary Technician Dictionary 95 (2000) as "[a] blood condition of abnormally high fat levels."

A-1934-24

Olive's health apparently would continue to oscillate greatly in the months that followed her cataract surgery. After a litany of veterinary appointments at both Oradell and Animal Eye Center based on an increasing number of reported concerns, Olive underwent a second eye surgery conducted by Dr. Holmberg on May 25, 2019, in an effort to regulate the dog's developing glaucoma.

Over the course of dozens more follow-up visits in which Olive was seen at both defendant practices, she was further noted to have corneal ulcers, and the pressure in both of her eyes continued to vary over time.

After Olive's health continued to decline in August 2019 following a trip in which plaintiff brought the dog with her to Italy, Olive's left eye was removed on August 16, 2019 after it had previously ruptured. Over the course of the next three weeks, Olive was taken to four different veterinary practices, as she failed to recover from her cumulative illnesses.

Eventually, Olive was euthanized on September 7, 2019, with a necropsy indicating the cause of death being "severe necrotizing chronic-active pancreatitis with peripancreatic and multicentric abdominal fat necrosis," as well as a "moderate pulmonary edema."[6]

---

[6] Defined in Delmar's Veterinary Technician Dictionary 152 (2000) as "[t]he accumulation of fluid in lung tissue."

A-1934-24

Plaintiff, then self-represented, filed a complaint in the Law Division in May 2021, alleging veterinary malpractice against the Oradell defendants and the Animal Eye Center defendants. After defendants filed their respective answers, plaintiff[7] served an affidavit of merit ("AOM") from Dr. Bart Sutherland, D.V.M.,[8] upon defendants on November 24, 2021. The AOM concluded that "there exists a reasonable probability that the care, skill, or knowledge exercised by the [defendants] . . . fell outside of acceptable professional or occupational standards or treatment practices." As we will discuss, infra, defendants did not move to declare the AOM deficient. The court did not convene a Ferreira[9] conference to address with the parties the sufficiency of the AOM.

Plaintiff elected to designate Dr. Sutherland, the AOM affiant, as her veterinary practice expert for the case. On April 17, 2023, Dr. Sutherland issued a ten-page, single-spaced expert report, which plaintiff served on defendants. The report was critical of both sets of defendants, opining that they each

---

[7] An attorney for plaintiff entered an appearance in March 2023. That initial attorney withdrew in August 2024, and plaintiff resumed representing herself until she retained her present counsel in January 2025.

[8] We discuss Dr. Sutherland's professional credentials, infra, in Part II(B).

[9] See Ferreira v. Rancocas Orthopedic Assocs., 178 N.J. 144, 154-55 (2003).

A-1934-24

deviated from professional standards of care in Olive's treatment and proximately caused her injury.

Among other things, with respect to the Oradell defendants, Dr. Sutherland stated (emphasis and bold face in original):

> **<u>Conclusions</u>**
>
> In the spring of 2018 'Olive' was diagnosed with diabetes by Oradell Animal Hospital. Her glucose levels never appear to stabilize to expected treatment levels. Expected treatments levels of glucose with a dog with diabetes melilotus is 100-250. The fact that initial diagnosis and treatment of diabetes in May of 2018 was made in the absence of a CBC, chemistry and further diagnostics concern me. Also establishing insulin treatment in such a relatively short time period with a very limited number of glucose checks are concerning as well. I am concerned a CBC could have revealed a potential infection such as pancreatitis. Also, a chemistry could have provided information on potential liver and/or kidney involvement. It appears 'Olive's' glucose was checked 3 or maybe 4 times after her first ever dose of insulin was given. My concern is that most of the literature I have reviewed state anywhere from 6 to 12 or possibly 24 glucose checks after being given insulin initially over a 12-24-hour period of time prior to establishing a treatment plan.
>
> https://www.vetsulin.com/dogs/glucose-curves.aspx.
>
> It seems that rather than try to identify the reason for the lack of stabilizing the up and down onslaught waves of the blood glucose and lack of remedying treatment with insulin, the problem was ignored. Unfortunately, this isn't just the clinicians at Oradell Animal Hospital

but also the Animal Eye Center of New Jersey. I tend to think had this problem been solved first, the issues that I discuss below would probably not have occurred.

**Medical Opinions**

. . . .

Concerns regarding Oradell Animal Hospital:

On May 20, 2019 a caretaker for [plaintiff] presented 'Olive' to Oradell Animal Hospital with a history of poor appetite, lethargic and trouble breathing. 'Olive' was seen by Dr. Erica Swanke and the owner talked by phone with Dr. Swanke. The owner explained concerns having just had surgery recently for cataracts and **the need to check 'Olive's' intraocular pressure**. 'Olive' was hospitalized and this information was passed along to Dr. John Lucy. In addition, on May 21, 2019 the owner stated to me that her friend and veterinarian Dr. Amanda Rogers relayed the concern regarding the recent eye surgery and intraocular pressures with Dr. Deborah Hall. On 5/21/19 & 5/22/19 'Olive's' intraocular pressures were recorded and both times they were elevated. The record shows that there **was not any action taken regarding the increasing intraocular pressures until 5/23/19**.

Having thus summarized this factual background, Dr. Sutherland further concluded:

. . . In my opinion this delay in treatment from the time intraocular pressures were noted to be elevated until eventual treatment caused the irreversible damages to 'Olive's' eye. Had treatment been instituted on the 5/21/19 the opportunity for response to treatment would have been significantly improved. From my review of the record and interview with [plaintiff], it appears that

9

it was happenstances that Dr. Brown noticed 'Olive's' condition since he was also working at the Oradell Animal Hospital and was likely the reason action was taken then. This lack of action in the treatment by the primary veterinarians Drs[.] Deborah Hall and John Lucy of Oradell Animal Hospital in my opinion directly affected the well-being and health of 'Olive'. It is my opinion that this delay is a **failure of the standard of veterinary care**.

Had Dr. Holmberg not performed the eyes surgery until 'Olive's' diabetes was stabilized, 'Olive' would have not likely needed to return to Oradell on 5/20/19 with the issues of poor appetite, lethargic and diarrhea. Had Drs[.] Hall and Lucy treated the increase eye pressures found on 5/21/19 in a timely manner, 'Olive' would have had a much better chance of a favorable response to treatment.

In my opinion, 'Olive's' fate seems to be sealed after these two series of unfortunate mistakes. By August [2019] [plaintiff] is advised by other ophthalmologists to have 'Olive's' left eye removed. In September [2019] [plaintiff] is strongly urged and does so by a team of veterinarians at Blue Pearl Specialty and Emergency Pet Hospital to have 'Olive' euthanized due to the severe chronic-active pancreatitis.

Neither the Oradell nor the Animal Eye Center defendants proffered an expert witness of their own. We also note that, although defendants deposed plaintiff, they chose not to take Dr. Sutherland's deposition.

Meanwhile, in December 2022, while plaintiff was still self-represented, the Oradell defendants moved to dismiss plaintiff's claim for emotional damages

10

with prejudice, or, in the alternative, dismiss her claims for both emotional and economic damages for a failure to provide discovery pursuant to Rule 4:23-5(a)(1). After conducting oral arguments in January and February 2023, a pretrial judge entered an order on February 6, 2023, with accompanying statements of reasons: (1) granting summary judgment in favor of the Oradell defendants as to plaintiff's claims for emotional distress damages, further dismissing such claims with prejudice; and (2) denying the Oradell defendants' motion to dismiss plaintiff's claims for economic damages. In support of his reasoning to dismiss plaintiff's emotional distress claims, the judge relied on the Supreme Court's opinion in McDougall v. Lamm, 211 N.J. 203 (2012), disallowing "bystander" claims by pet owners for negligent infliction of emotional distress. (Emphasis added). Plaintiff moved for reconsideration of the motion ruling, which the court denied.

In November 2023, plaintiff and the Animal Eye Center defendants entered into a stipulation, dismissing her claims against those defendants with prejudice. The case proceeded solely against the Oradell defendants, with discovery extended several times through a series of case management orders. On April 12, 2024, a case management order specified that plaintiff's expert reports were to be served by May 15, 2024, with expert depositions to be

11

completed by June 28, 2024, and with a revised Discovery End Date of June 28, 2024. That order declared that "there will be no further [discovery] extensions" and "[t]his will be the last opportunity to complete discovery."

After the aforesaid May 15, 2024 deadline for plaintiff's expert reports had passed, the Oradell defendants filed a motion on July 16, 2024 to bar the trial testimony of Dr. Sutherland. Their motion was essentially based on two arguments. First, Dr. Sutherland allegedly lacked sufficient qualifications to express expert opinions about deviations by Drs. Hall and Lucy from veterinary standards of care because, unlike them, Dr. Sutherland is not Board-certified in small-animal veterinary internal medicine. Second, even if Dr. Sutherland were deemed qualified, his expert report faulting defendants' conduct amounts to an inadmissible net opinion.

After hearing oral argument from counsel for the Oradell defendants and the then-self-represented plaintiff, the second motion judge granted the motion to bar Dr. Sutherland. In his oral opinion, the judge referred to the Patients First Act and that statute's requirements that expert opinions on standards of care deviations by physicians be presented by experts with similar Board-certifications as the defendants in the applicable subject matters. The judge also

12

agreed with the defense that the views expressed in Dr. Sutherland's report constituted inadmissible net opinions.

Following these rulings barring Dr. Sutherland, the Oradell defendants moved for summary judgment, arguing that plaintiff's veterinary malpractice claims required the support of a qualified expert and noting that the deadline for plaintiff to serve an appropriate liability expert report had already passed. Plaintiff, meanwhile, moved to extend discovery, which the trial court denied. Shorn of her liability expert, plaintiff filed no substantive opposition to summary judgment, which the trial court granted.

In this ensuing appeal in which she is represented by successor counsel, plaintiff seeks reversal of the trial court's orders (1) barring her expert Dr. Sutherland, (2) granting summary judgment on liability, and (3) precluding her claims for emotional-distress damages if her complaint is reinstated.

## II.

In addressing the issues on appeal, we are guided by familiar principles. It is well-settled that a claim for professional negligence must be supported by expert opinion, except for the narrow exception of matters of "common knowledge." Parker v. Goldstein, 78 N.J. Super. 472, 479-80 (App. Div. 1963); see also Rosenberg v. Tavorath, 352 N.J. Super. 385, 399 (App. Div. 2002). It

13

is beyond dispute that this is not a "common knowledge" case, as it involves criticisms of licensed professionals beyond the ken of ordinary citizens.

A.

The general AOM statute that is designed to filter out unmeritorious professional liability claims, N.J.S.A. 2A:53A-27, requires an AOM to be served by a plaintiff within sixty days of the filing of the answer of a licensed professional covered by the statute. Such a liability expert must detail the standards of care for the professional and identify how the professional deviated from that standard. Parker, 78 N.J. Super. at 479-80. Without a sufficient expert report, a plaintiff in a malpractice case cannot demonstrate the material dispute in fact necessary to survive a defendant's summary judgment motion. See Weissman v. Li, 482 N.J. Super. 587, 592 (App. Div. 2025); see also L.G.-P. v. Riverview Med. Ctr., ___ N.J. Super. ___ (App. Div. 2026).

It is clear that Drs. Hall and Lucy, as veterinarians, are licensed professionals within the ambit of the AOM statute. The term "licensed person" under that statute explicitly encompasses "veterinarian[s]," among a voluminous and eclectic variety of other professionals. N.J.S.A. 2A:53A-26(n).

With regard to the licensing of veterinarians in our state, N.J.S.A. 45:16-8.1 provides that:

A-1934-24

Any person shall be regarded as practicing veterinary medicine within the meaning of this chapter, who, <u>either directly or indirectly</u>, diagnoses, prognoses, treats, administers, prescribes, operates on, manipulates, or applies any apparatus or appliance <u>for any disease, pain, deformity, defect, injury, wound or physical condition of any animal</u>, including poultry and fish, <u>or who prevents or tests for the presence of any disease in animals</u>, or who performs embryo transfers and related reproductive techniques, or who holds himself out as being able or legally authorized to do so.

[(Emphasis added).]

An associated regulation, N.J.A.C. 13:44-3.1, conceives of the "[p]ractice of veterinary medicine, surgery and dentistry" in similarly broad terms, defining it as:

[T]o directly or indirectly diagnose, prognose, treat, correct, change, relieve or prevent animal disease, deformity, defect, injury, wound or other physical or mental condition; including the prescription or administration of any drug, medicine, biologic, apparatus, application, anesthetic or other therapeutic or diagnostic substance or technique <u>on any animal</u> including, but not limited to, animal acupuncture, surgical or dental operations, animal chiropractic, theriogenology, alternative or complementary veterinary medicine, surgery, including cosmetic surgery, any manual, mechanical, biological or chemical procedure for testing for the presence of any disease or pregnancy or for correcting sterility or infertility, including embryo transfer, <u>or to render service or recommendations with regard to any of the above and all other branches of veterinary medicine, surgery and dentistry</u>.

A-1934-24

[(Emphasis added).]

A "State Board of Veterinary Medical Examiners" was created by our Legislature in March 1902, with an overt mission "'to regulate the practice of veterinary medicine, surgery and dentistry in the State of New Jersey, to license veterinarians and to punish persons violating the provisions thereof.'" N.J.S.A. 45:16-1 (quoting L. 1902, c. 18 at 36). To obtain one's license as a veterinarian, applicants are required to "submit to an examination, to be written, oral, or both, designed to test the examinee's knowledge of any laws, rules and regulations applicable in [New Jersey]." N.J.S.A. 45:16-4.[10] "The board shall issue forthwith to each applicant who has passed the examination, and who shall have been adjudged duly qualified for the practice of veterinary medicine, surgery and dentistry, a license to practice the same." N.J.S.A. 45:16-5.

Through what is known as the "Patients First Act," the AOM statute was amended in 2004 to strengthen the requirements for expert witnesses who allege deviations by physicians, i.e., medical doctors who treat humans. Codified at N.J.S.A. 2A:53A-37 to -42, the Patients First Act prescribes that:

> In an action alleging medical malpractice, a person shall not give expert testimony or execute an affidavit pursuant to the provisions of P.L. 1995, c. 139 (C.

---

[10] Notably, this testing provision has substantially altered over time since 1902, when the statute was first enacted.

A-1934-24

2A:53A-26 et seq.) on the appropriate standard of practice or care unless the person is licensed as a physician or other health care professional in the United States and meets the following criteria:

> a. If the party against whom or on whose behalf the testimony is offered is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association and the care or treatment at issue involves that specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association, the person providing the testimony shall have specialized at the time of the occurrence that is the basis for the action in the same specialty or subspecialty, recognized by the American Board of Medical Specialties or the American Osteopathic Association, as the party against whom or on whose behalf the testimony is offered . . . .

[N.J.S.A. 2A:53A-41 (emphasis added).]

In 2016, the Supreme Court made clear that "the like-qualified standard prescribed in the Patients First Act . . . applies only in actions for medical malpractice. In all other negligence actions against a licensed professional, the credential standards outlined in N.J.S.A. 2A:53A-27 . . . apply." Meehan, 226 N.J. at 221 (emphasis added).

Although the term "health care professional" is undefined within the text of the Patients First Act, the Court in Meehan held that the "plain language of

sections 27 and 41 [of N.J.S.A. 2A:53A] lead to the inexorable conclusion that the <u>enhanced credential requirements established under section 41</u> for those submitting affidavits of merit <u>and expert testimony apply only to physicians in medical malpractice actions</u>," and excludes other licensed professionals, such as a dentist, which was the specific occupation at issue in <u>Meehan</u>. <u>Id.</u> at 234-35.

The trial court here erred as a matter of law in requiring Dr. Sutherland, a licensed veterinarian, to possess the same Board-certifications as Drs. Hall and Lucy in this case. It appears that plaintiff, who was then representing herself,[11] did not cite <u>Meehan</u> to the trial court when the motion to bar Dr. Sutherland was orally argued. Nor did the court's decision refer to <u>Meehan</u>. In any event, we must reverse the court's legal error, based on the precedent in <u>Meehan</u>.

B.

We next must turn to an alternative question of whether the trial court erred in deeming Dr. Sutherland insufficiently credentialed under the general

---

[11] Although it is not a basis for our decision, we do note the timing of the defense motion to bar Dr. Sutherland after (1) not contesting his AOM, (2) the lack of a <u>Ferriera</u> conference scheduled, which was filed by the court, and (3) waiting to move until after the discovery deadline when it was too late for plaintiff to seek a substitute expert, appears to have been designed to capitalize on the situation. We do not rule that the defense was required to file a motion in limine at all, or to file one sooner, but the present posture of the case appears to have been in part the result of perhaps strategic timing and owing to plaintiff's self-represented status for much of the pretrial period.

A-1934-24

standards for admitting expert testimony discrete from the Patients First Act. That issue implicates the general terms of the AOM statute and also N.J.R.E. 702.

N.J.S.A. 2A:53A-27 states that:

> . . . [T]he person executing the [AOM] shall be <u>licensed</u> in this or any other state; have <u>particular expertise in the general area or specialty involved</u> in the action, as evidenced by board certification <u>or</u> by devotion of the person's practice substantially to the general area or specialty involved in the action for a period of at least five years.
>
> [(Emphasis added).]

Here, plaintiff submits that, although Dr. Sutherland does not possess the board-certifications held by the defendant veterinarians, he has sufficient expertise in the "general area or specialty involved" in this case and has devoted his practice "substantially to the general area or specialty involved in the action for a period of at least five years." We agree.

As his curriculum vitae and certification provided in the record document indicate, Dr. Sutherland has been licensed as a veterinarian in multiple states since 1994. He attests that he has remained "an actively practicing veterinarian, providing medical, surgical, and dental care for small, large, and exotic animals since 1994," a period well beyond the five-year minimum required by N.J.S.A.

19

2A:53A-27. He is a "Level II USDA Federally Accredited Veterinarian," and attests that he remains "qualified and up-to-date in the practice of veterinary medicine and the standards of care."

Although, as defendants and the trial court have observed, Dr. Sutherland appears to have devoted much of his private practice to equine cases, there is sufficient evidence that he also possesses the qualifications to opine about the standards of care for small animals such as Olive. Defendants chose not to take Dr. Sutherland's deposition to delve more into his experience and develop potential impeachment. At the very least, his credentials on their face reflect sufficient credentials to testify in this case. Any alleged shortfalls in his experience go to the weight of his testimony at trial rather than admissibility, subject to question-by-question objections that defense counsel may interpose on discrete subjects.

The same conclusion applies to Dr. Sutherland's eligibility to provide expert opinions under N.J.R.E. 702. The rule states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 702. "[N.J.R.E.] 702 is

'permissive,' and '[i]n the broadest of terms, if an issue to be decided by the trier of fact is of such a specialized nature that the trial court determines that the proposed expert testimony would assist the trier of fact in making its determination, then the testimony may be admitted.'" Jacobs v. Jersey Cent. Power & Light Co., 452 N.J. Super. 494, 505 (App. Div. 2017) (internal citation omitted) (emphasis in original). Dr. Sutherland's asserted level of expertise satisfies these requirements.

We therefore respectfully conclude that the trial court misapplied its discretion in concluding that Dr. Sutherland lacked the requisite credentials to present expert testimony in this case respecting the applicable veterinary standards of care. See Townsend v. Pierre, 221 N.J. 36, 52 (2015) (reciting the abuse-of-discretion scope of review).

## C.

We next consider the trial court's alternative conclusion that, even if Dr. Sutherland were deemed to have sufficient qualifications, his ten-page expert report in this case on standards of care and causation is reflective of inadmissible "net opinions." The applicable principles on this issue are well established under case law.

A-1934-24

"The net opinion rule 'forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" State v. McGuigan, 478 N.J. Super. 284, 307-08 (App. Div. 2024) (quoting State v. Burney, 255 N.J. 1, 23 (2023)). Expert opinions that are "'based merely on unfounded speculation and unquantified possibilities'" must be excluded. Townsend, 221 N.J. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). Experts must "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Ibid. (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). "In short, they must '"give the why and wherefore" that supports the opinion, "rather than a mere conclusion."'" Weissman, 482 N.J. Super. at 599 (internal citations omitted).

"That being said, we are mindful that, as the [Supreme] Court observed in Townsend, '[t]he net opinion rule is not a standard of perfection. The rule does not mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable.'" Ibid. (quoting Townsend, 221 N.J. at 54) (emphasis added).

As we noted above, defendants did not move to bar Dr. Sutherland's expert opinions until after the discovery deadlines had passed, and they elected not to

take his deposition. We are therefore supplied, as was the trial court, with a quite limited record on which to evaluate the adequacy of the expert's reasoning. It is hard on this record to assess whether the expert's analysis adequately elaborates the "why and wherefore" underlying his analysis.

Given that the viability of Dr. Sutherland's opinions is case-dispositive, we remand this matter for an evidentiary hearing under N.J.R.E. 104 to illuminate in greater depth the expert's reasoning. In support of that request, plaintiff cites to Kemp, 174 N.J. at 432-33. In Kemp, a majority of our Supreme Court declared that, "in cases in which the scientific reliability of an expert's opinion is challenged and the court's ruling on admissibility may be dispositive of the merits, the sounder practice is to afford the proponent of the expert's opinion an opportunity to prove its admissibility at a Rule 104 hearing." Ibid. (emphasis added). Conducting a Rule 104 hearing in this way "allows the court to assess whether the expert's opinion is based on scientifically sound reasoning or unsubstantiated personal beliefs couched in scientific terminology." Id. at 427 (citing Landrigan, 127 N.J. at 414).

Although a request for a Rule 104 hearing was not made by plaintiff to the trial court when she was self-represented, we are persuaded the "sounder practice" here would be for the trial court to conduct such a hearing. Indeed, in

<u>Kemp</u> itself, no such hearing had been requested in the trial court, and the Supreme Court determined that it was nonetheless an appropriate course of action. <u>Id.</u> at 432-33.

We therefore vacate, without prejudice, the trial court's ruling, subject to a forthcoming Rule 104 hearing pursuant to <u>Kemp</u>. The trial court will have the discretion to allow a discovery deposition of Dr. Sutherland in advance of the hearing.

D.

As the last issue to discuss, we briefly consider the with-prejudice dismissal of plaintiff's claims for emotional distress. In evaluating that issue, which was adjudicated on a motion for summary judgment, we consider the record in a light most favorable to plaintiff. <u>See</u> <u>R.</u> 4:46-2; <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 523 (1995). The trial court correctly recognized that the Supreme Court's opinion in <u>McDougall</u>, 211 N.J. at 207, is the seminal case on the issue. In <u>McDougall</u>, our Supreme Court considered "whether a pet owner should be permitted to recover for emotional distress caused by observing the traumatic death of that pet." <u>Id.</u> at 206. Although recognizing that "many people form close bonds with their pets," the Court ultimately concluded, as a matter of New Jersey law, that "those bonds do not

24

rise to the level of a close familial relationship or intimate, marital-like bond" as had been recognized in cases such as Portee v. Jaffee, 84 N.J. 88, 103-04 (1980) (allowing such claims involving the emotional distress of a parent who observes an injury to the parent's child in certain circumstances). McDougall, 211 N.J. at 207. Accordingly, the Court "decline[d] to expand the traditionally and intentionally narrow grounds established in Portee to include claims arising from the death of a pet." Ibid.

The present case may be factually distinguishable from McDougall insofar as it entails, at least in part, a claim by plaintiff that she was more than a mere bystander to Olive's injuries and suffering because she was directed by the doctors to inject medication into Olive's body on a repeated basis. As plaintiff noted at her deposition (which occurred after her emotional distress claims were already dismissed), she was alarmed and upset by having to inject what she termed as medication that was "poisoning" her dog. That direct and active participation caused plaintiff to consult with her treating psychologist, as is documented in the psychologist's records.

Viewing the record, as it was further developed, in a light most favorable to plaintiff, we accordingly remand the issue to the trial court for reconsideration

and to address explicitly the viability of plaintiff's contention that her role exceeded that of a mere bystander.

III.

All other arguments raised on appeal lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

Reversed in part as to the expert credentials ruling; and vacated and remanded in part as to the net opinion and emotional distress rulings.  We do not retain jurisdiction and intimate no views on the ultimate merits of the case. The trial court shall convene a case management conference within thirty days.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division